United States District Court

Western District of Texas (Austin) Division

FILED

## Complaint    A16CV1117   SS

Parties:

RYAN GALLAGHER, as an individual and on behalf of all others similarly situated,

Plaintiff,

103 E 31st St

Austin, TX, 78705

V.

CHUCK ROSENBERG

DRUG ENFORCEMENT AGENCY;

8701 Morrissette Dr.

Springfield, VA 22152

LORETTA LYNCH

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA;

950 Pennsylvania Avenue, NW

Washington, DC 20530

STEPAN COMPANY

22500 Stepan Road

Elwood, IL 60421

MALLINCKRODT PHARMACEUTICALS

675 McDonnell Blvd.

St. Louis, MO 63042

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

Plaintiff, RYAN GALLAGHER, Pro Se, hereby files this Class Action Complaint, individually, and on behalf of all others similarly situated—and makes these allegations based on information and belief and/or which are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery—against Defendants, Drug Enforcement Agency ("DEA" or "Defendant"), Attorney General ("AG" or "Defendant 2"), Stepan Company ("Defendant 3") & Mallinckrodt Pharmaceutical ("Defendant 4") as follows:

I.    **Introduction**

1.   DEA has violated the Rights which are guaranteed by the Amendments & Clauses of the Constitution, as well as International Agreements (see various Sections below & Exhibits).

2.   Defendant & Defendant 2 have assassinated the Character of Religious Practitioners, and Religions themselves, by Over-Broadly, and Unconstitutionally applying the Controlled Substances Act.

3.   Defendant 3 and Defendant 4 are, in Collusion with Defendant and Defendant 2, operating an illegal Monopoly (see section XII, Exhibit 11, Exhibit 13  & United States of America, Appellee v. Microsoft Corporation, Appellant, 253 F.3d 34 (D.C. Cir. 2001)). Without Defendant and Defendant 2 protecting Defendant 3, companies such as Coca-Cola would not have to go directly to Defendant 3 for product, and their would be healthy competition, which is being blocked by this Monopoly. Put simply, Defendant 3 Imports the Product and has a Monopoly of the leaves and their extract (Defendant 3's Monopoly involves primarily the sale of leaf extract to Corporations across the Country, e.g. Coca-Cola), Defendant 4 has a Monopoly on receiving a certain product from Defendant 3 and purifies it (and Defendant 4's Monopoly is of a Pharmaceutical nature), Defendant Enforces this Monopoly by arresting, imprisoning or even killing anyone who infringes on this Monopoly and Defendant 2 ensures that Interpretations of Legislation continue to protect such Monopolies.

4.   Defendant 3 and Defendant 4 have publically traded stock on the NYSE, meaning that the Controlled Substances Act is actively protecting Stocks

5.   Taxpayer Dollars, via Defendant, are being used to secure this Monopoly, via the Controlled Substances Act. (see Flast v. Cohen 392 U.S. 83 (1968))

6.   Law Enforcement in the Plaintiff's Home Town of Mckinney, Texas, did Illegally enter his property, warrantless (2010), and for the sole purpose of illegally seizing Marijuana which existed for Religious use. This case was later dismissed (2015), but the looming threat of arrest and illegal action taken by law enforcement stands ever present for the Plaintiff and Class Members.

7.   My Family member, 12 year old brother MASON WIGHT, has lost his life due to the Overbroad, Unconstitutional, Enforcement of these laws. And many other lose their lives every day in furtherance of this Monopoly.

8.  Defendant could easily end the Monopoly simply by opening up registration to all US Citizens or Companies (see Exhibit 16) and accepting those that qualify, instead of only allowing 1 company to retain control of the entirety of each market, but instead chooses to enforce Monopoly.

9. Defendant and Defendant 2 allow for various Medical and Industrial Exemptions (non-Constitution related) but fail to provide religious Exemptions (Constitutionally Guaranteed by the 1st Amendment)

## II.    Venue and Jurisdiction

28 USC S 1442

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

(2) A property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States.

(3) Any officer of the courts of the United States, for or relating to any act under color of office or in the performance of his duties;

(4) Any officer of either House of Congress, for or relating to any act in the discharge of his official duty under an order of such House.

Title II Rule 3, 4.1 & 5

## Rule 3. The Complaint

The complaint is a written statement of the essential facts constituting the offense charged. Except as provided in Rule 4.1, it must be made under oath before a magistrate judge or, if none is reasonably available, before a state or local judicial officer.

Or

Federal Rules of Civil Procedure, Rule 5.1

Rule 5.1

(a) Notice by a Party. A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly:

(1) file a notice of constitutional question stating the question and identifying the paper that raises it, if:

(A) a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity; or

(B) a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity; and

(2) serve the notice and paper on the Attorney General of the United States if a federal statute is questioned—or on the state attorney general if a state statute is questioned—either by certified or registered mail or by sending it to an electronic address designated by the attorney general for this purpose.

(b) Certification by the Court. The court must, under 28 U.S.C. §2403, certify to the appropriate attorney general that a statute has been questioned.

(c) Intervention; Final Decision on the Merits. Unless the court sets a later time, the attorney general may intervene within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier. Before the time to intervene expires, the court may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional.

(d) No Forfeiture. A party's failure to file and serve the notice, or the court's failure to certify, does not forfeit a constitutional claim or defense that is otherwise timely asserted.

28 U.S. Code § 1332

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

(1)

citizens of different States;

(2)

citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

(3)

citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4)

a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

§ 12 Clayton Act, 15 U.S.C. § 22
District in which to sue corporation

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

§ 16 Clayton Act, 15 U.S.C. § 26
Injunctive relief for private parties; exception; costs

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing

that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue.... In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

(c) For the purposes of this section and section 1441 of this title—

(1) a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of—

(A)

every State and foreign state of which the insured is a citizen;

(B)

every State and foreign state by which the insurer has been incorporated; and

(C)

the State or foreign state where the insurer has its principal place of business

## III.   Parties

1.  Plaintiff has been arrested and harassed for Practicing his Religion. No Convictions have been made, but under the current, illegal, interpretations of this law there is an ever present danger.

2.  The Monopolization of Substances is creating a not only dangerous, but violent atmosphere.

3.  Anyone practicing the same Religion or a similar Religion is at risk of also being arrested, harassed, and possibly even being killed, for Practicing their Religion.

4.  Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).  As set forth below, Plaintiff is a citizen of Texas, and Defendants are citizens of other States. Therefore, diversity of citizenship exists under CAFA and diversity jurisdiction, as required by 28 U.S.C. §§ 1332(a)(1), (d)(2)(A). Furthermore, Plaintiff alleges on

information and belief that more than two-thirds of all of the members of the proposed Plaintiff Class in the aggregate are citizens of a state other than Texas, where this action is originally being filed, and that the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. §

5.   1332(d)(5)(B).

## IV.   Factual Allegations

1.   Defendant 2 Interprets laws, and Defendant Enforces law which operate an Unconstitutional violation of Rights.
2.   Defendant Enforces laws, and Defendant 3 benefits from that Enforcement, allowing for an illegal Monopoly to be perpetuated.

## V.   Class Action Allegations

1.   Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.
2. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this class action and seeks certification of the claims and certain issues in this action on behalf of a Class defined as:

**All United States Persons who practice Hinduism (or similarly barred Religion) or who are or wish to become Sadhus (Hindu Priests), or who have been barred from doing so for fear of the Controlled Substances Act, as well as any Hindu (or similar Religious Practitioner) who has been jailed or imprisoned as a result of this Act. As well as anyone who has lost the life of a family member due to this Act; and**

**All United States Persons who have been financially affected by the Monopoly enforced and operated by Defendants. As well as anyone who was jailed or imprisoned in the course of the enforcement of this Monopoly, family members of those killed in the process of that enforcement and anyone who has been in fear for their life or safety as a result of the enforcement of the Monopoly and overbroad enforcement of the Controlled Substances Act in general.**

## VI.    First Cause of Action: Violation of the Free Exercise Clause

1. Religious Freedom and Schedule I Substances
(as per *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418
(2006)),

*"Also rejected is the Government's central submission that, because it has a compelling interest in the uniform application of the Controlled Substances Act, no exception to the DMT ban can be made to accommodate the UDV.  The Government argues, inter alia, that the Act's description of Schedule I substances as having "a high potential for abuse," "no currently accepted medical use," and "a lack of accepted safety for use . . . under medical supervision," 21 U. S. C. §812(b)(1), by itself precludes any consideration of individualized exceptions, and that the Act's "closed" regulatory system, which prohibits all use of controlled substances except as the Act itself authorizes, see Gonzales v. Raich, 545 U. S. ___, ___, cannot function properly if subjected to judicial exemptions. Pp. 8–16. (a) RFRA and its strict scrutiny test contemplate an inquiry more focused than the Government's categorical approach.  RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular claimant whose sincere exercise of religion is being substantially burdened.  42 U. S. C. §2000bb–1(b). Section 2000bb(b)(1) expressly adopted the compelling interest test of Sherbert v. Verner, 374 U. S. 398, and Wisconsin v. Yoder, 406 U. S. 205. There, the Court looked beyond broadly formulated interests justifying the general applicability of government mandates, scrutinized the asserted harms, and granted specific exemptions to particular religious claimants.  Id., at 213, 221, 236; Sherbert, supra, at 410.  Outside the Free Exercise area as well, the Court has noted that "[c]ontext matters" in applying the compelling interest test, Grutter v. Bollinger, 539 U. S. 306, 327, and has emphasized that strict scrutiny's fundamental purpose is to take  "relevant differences" into account, Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 228. Pp. 9–10. (b) Under RFRA's more focused inquiry, the Government's mere invocation of the general characteristics of Schedule I substances cannot carry the day.  Although Schedule I substances such as DMT are exceptionally dangerous, see, e.g., Touby v. United States, 500 U. S. 160,*

*162, there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue.*

*...*

*Before the District Court, the Government also asserted an interest in compliance with the 1971 United Nations Convention on Psychotropic Substances, Feb. 21, 1971, [1979–1980], 32 U. S. T. 543, T. I. A. S. No. 9725. The Convention, signed by the United States and implemented by the Controlled Substances Act, calls on signatories to prohibit the use of hallucinogens, including DMT.  The Government argues that it has a compelling interest in meeting its international obligations by complying with the Convention. The District Court rejected this interest because it found that the Convention does not cover hoasca.  The court relied on the official commentary to the Convention, which notes that "Schedule I [of the Convention] does not list natural hallucinogenic materials," and that "[p]lants as such are not, and it is submitted are also not likely to be, listed in Schedule I, but only some products obtained from plants." U. N. Commentary on the Convention on Psychotropic Substances 387, 385 (1976).  The court reasoned that hoasca, like the plants from which the tea is made, is sufficiently distinct from DMT itself to fall outside the treaty. See 282 F. Supp. 2d, at 1266–1269. We do not agree.  The Convention provides that "a preparation is subject to the same measures of control as the psychotropic substance which it contains," and defines "preparation" as "any solution or mixture, in whatever physical state, containing one or more psychotropic substances." See 32 U. S. T., at 546, Art. 1(f)(i); id., at 551, Art. 3. Hoasca is a "solution or mixture" containing DMT; the fact that it is made by the simple process of brewing plants in water, as opposed to some more advanced method, does not change that. To the extent the commentary suggests plants themselves are not covered by the Convention, that is of no moment—the UDV seeks to import and use a tea brewed from plants, not the plants themselves, and the tea plainly qualifies as a "preparation" under the Convention. The fact that hoasca is covered by the Convention, however, does not automatically mean that the Government has demonstrated a compelling interest in applying the Controlled Substances Act, which implements the Convention, to the UDV's sacramental use of the tea."*

2. All Religions, even Nonmainstream Religions, are Protected under the RLUIPA
(via Cutter v. Wilkinson, 544 U.S. 709 (2005))

*"officials (respondents here), in violation of RLUIPA, have failed to accommodate their religious exercise "in a variety of different ways, including retaliating and discriminating against them for exercising their nontraditional faiths, denying them access to religious literature, denying them the same opportunities for group worship that are granted to adherents of mainstream religions, forbidding them to adhere to the dress and appearance mandates of their religions, withholding religious ceremonial items..."*

### 2. Historical Precedent of Religious Practices
(via Church of the Lukumi Babalu Aye, Inc. v. Hialeah 508 U.S. 520 (1993))

*"The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, see Cantwell v. Connecticut, 310 U. S. 296, 303 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof .... " (Emphasis added.) The city does not argue that Santeria is not a "religion" within the meaning of the First Amendment. Nor could it. Although the practice of animal sacrifice may seem abhorrent to some, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Bd. of Indiana Employment Security Div., 450 U. S. 707, 714 (1981). Given the historical association between animal sacrifice and religious worship, see supra, at 524-525, petitioners' assertion that animal sacrifice is an integral part of their religion "cannot be deemed bizarre or incredible." Frazee v. Illinois Dept. of Employment Security, 489 U. S. 829, 834, n. 2 (1989)."*

### 3. Other Case Law
Corp. of Presiding Bishop v. Amos483 U.S. 327 (1987)
Everson v. Board of Education330 U.S. 1 (1947)
Cantwell v. Connecticut310 U.S. 296 (1940)

## VII.    Second Cause of Action: Violation of the 18th/21st Amendments

### 1. Medical Definition of *liquor*
(via Merriam Website)

*a: a liquid substance: as a: a usually distilled rather than fermented alcoholic beverage b: a solution of a medicinal substance usually in water—compare tincture*

Examples:

Liquid Cocaine/Coca-Cola, Liquid Opium/Laudanum, Liquid Marijuana/Bhang

2. Wording of the 18th Amendment

AMENDMENT XVIII

*Passed by Congress December 18, 1917. Ratified January 16, 1919. Repealed by amendment 21.*

**Section 1.**

*After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.*

**Section 2.**

*The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation.*

**Section 3.**

*This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress.*

3. Wording of the 21st Amendment

AMENDMENT XXI

*Passed by Congress February 20, 1933. Ratified December 5, 1933.*

**Section 1.**

*The eighteenth article of amendment to the Constitution of the United States is hereby repealed.*

**Section 2.**

*The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.*

**Section 3.**

*This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress.*

3. Commerce Clause & Intoxicating Liquors. Intoxicating Liquors
(via Granholm v. Heald 544 U.S. 460 (2005))

*"the Court held that the Commerce Clause prevented States from passing facially neutral laws that placed an impermissible burden on interstate commerce. Rhodes v. Iowa, 170 U. S. 412 (1898); Vance v. W. A. Vandercook Co., 170 U. S. 438 (1898); Leisy v. Hardin, 135 U. S. 100 (1890); Bowman v. Chicago & Northwestern R. Co., 125 U. S. 465 (1888). For example, in Bowman v. Chicago & Northwestern R. Co., 125 U. S. 465 (1888), the Court struck down an Iowa statute that required all liquor importers to have a permit. Bowman and its progeny rested in part on the since-rejected original-package doctrine. Under this doctrine goods shipped in interstate commerce were immune from state regulation while in their original package. As the Court explained in Vance,*

*"the power to ship merchandise from one State into another carries with it, as an incident, the right in the receiver of the goods to sell them in the original packages, any state regulation to the contrary notwithstanding; that is to say, that the goods received by Interstate Commerce remain under the shelter of the Interstate Commerce clause of the Constitution, until by a sale in the original package they have been commingled with the general mass of property in the state." 170 U. S., at 444–445. Bowman reserved the question whether a State could ban the sale of imported liquor altogether. 125 U. S., at 499–500. Iowa responded to Bowman by doing just that but was thwarted once again. In Leisy, supra, the Court held that Iowa could not ban the sale of imported liquor in its original package.*

…

*To resolve the matter, Congress passed the Wilson Act (so named for Senator Wilson of Iowa), which empowered the States to regulate imported liquor on the same terms as domestic liquor:*

*"That all fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." Ch. 728, 26 Stat. 313 (codified at 27 U. S. C. §121)."*

4.Other Case Law

Nebraska and Oklahoma v. Colorado (2016)

North Dakota v. United States495 U.S. 423 (1990)

Bacchus Imports, Ltd. v. Dias 468 U.S. 263 (1984)

Mugler v. Kansas 123 U.S. 623 (1887)

Scott v. Donald 165 U.S. 58 (1897)

Craig v. Boren429 U.S. 190 (1976)

Levitan and Leonardo v.Ashcroft, District Court for DC (No. 99cv00017)

5. The Importance of Religious Exemption & Indication via legislation that "Intoxicating Liquors" includes more than just Malt or Vinous based Liquors.

(via The Volstead Act)

*"TITLE I.*

*TO PROVIDE FOR THE ENFORCEMENT OF WAR PROHIBITION.*

*The term "War Prohibition Act" used in this Act shall mean the provisions of any Act or Acts prohibiting the sale and manufacture of intoxicating liquors until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States. The words "beer, wine, or other intoxicating malt or vinous liquors" in the War Prohibition Act shall be hereafter construed to mean any such beverages which contain one-half of 1 per centum or more of alcoholic beverages by volume.*

*TITLE II.*

*PROHIBITION OF INTOXICATING BEVERAGES.*

*SEC. 3.*

*No person shall on or after the date when the eighteenth amendment to the Constitution of the United States goes into effect, manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor except as authorized in this Act, and all the provisions of this shall be liberally construed to the end that---the use of intoxicating liquor as a beverage may be prevented.*

*Liquor for nonbeverage purposes and wine for sacramental purposes may be manufactured, purchased. sold, bartered, transported, imported, exported, delivered furnished and possessed, but only as herein provided, and the commissioner may, upon application, issue permits therefor. Provided, That nothing in this Act shall prohibit the purchase and sale of warehouse receipts covering distilled spirits on deposit in Government bonded warehouses, and no special tax liability shall attach to the business of purchasing and selling such warehouse receipts.*

*…*

*Nothing in this title shall be held to apply to the manufacture, sale, transportation, importation, possession, or distribution of wine for sacramental purposes, or like religious rites, except section 6 (save as the same requires a permit to purchase) and section 10 hereof, and the provisions of this Act prescribing penalties for the violation of either of said sections. No person to whom a permit may be issued to manufacture, transport, import, or sell wines for sacramental purposes or like religious rites shall sell, barter, exchange, or furnish any such to any person not a rabbi, minister of the gospel, priest, or an officer duly authorized for the purpose by any church or congregation, nor to any such except upon an application duly subscribed by him, which application, authenticated as regulations may prescribe, shall be filed and preserved by the seller.*

*The head of any conference or diocese or other ecclesiastical jurisdiction may designate any rabbi, minister, or priest to supervise the manufacture of wine to be used for the purposes and rites in this section mentioned, and the person so designated may, in the discretion of the commissioner, be granted a permit to supervise such manufacture."*

VIII.     **Third Cause of Action: Violation of the 9th Amendment**

1. The 9th Amendment:

*"The enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people."*

2. Unconstitutional Acts are not Law

(via Norton v. Shelby County. 118 U.S. 425)

*"An unconstitutional act is not law; it confers no rights; imposes no duties; affords no protection; it creates no office; it is in legal contemplation, as inoperative as it had never been passed."*

(via Marbury v. Madison, 5 US 137)

*"The Constitution of these United States is the supreme law of the land. Any law that is repugnant to the Constitution is null and void of law."*

3. Rights are not Privileges, they are Rights

(via Shuttlesworth v. Birmingham, 373 US 262)

*"If the State converts a liberty into a privilege, the citizen can engage in the right with impunity."*

(via Murdock v. Penn., 319 US 105)

*"No state shall convert a liberty into a privilege, license it, and attach a fee to it."*

4. For an Official to Ignore Constitutional Rights is to violate their Office

(via Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401 (1958))

*"No State legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it."*

(via Owen v. Independence, 100 S.C.T. 1398, 445 US 622)

*"Officers of the court have no immunity, when violating a Constitutional right, from liability. For they are deemed to know the law."*

(via Boyd v. U.S., 116 U.S. 616)

*"The court is to protect against any encroachment of Constitutionally secured liberties."*

(via 5 U.S. Code § 3331)

*"An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take the following oath: "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." This section does not affect other oaths required by law."*

### 5. Pattern or Practice
### 42 U.S. Code § 14141
### (a) Unlawful conduct

*"It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."*

### 6. Acting Under Color of Law to Violate Rights
### (via United States v. Price 383 U.S. 787 (1966))

*""Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. . . ."*

*...*

*charge all of the defendants not with conspiracy, but with substantive violations of Title 18 § 242. Each of these counts charges that the defendants, acting "under color of the laws of the State of Mississippi," "did willfully assault, shoot and kill" Schwerner, Chaney and Goodman, respectively"*

## IX.  Fourth Cause of Action: Violation of the Rights of Persons and Corporate Persons under the 14th Amendment

1.  Corporations, and people, have Religious Rights to believe and Practice Religion
(via Burwell v. Hobby Lobby, 573 U.S. ___ (2014))

*"It held that the Greens' businesses are "persons" under RFRA, and that the corporations had established a likelihood of success on their RFRA claim because the contraceptive mandate substantially burdened their exercise of religion..."*

2. Religious Corporations are exempt from certain laws, even if they are not related to belief
(via Walz v. Tax Comm'n of City of New York, 397 U.S. 664 (1970))

*"The legislative purpose of the property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its "moral or mental improvement," should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes. It has not singled out one particular church or religious group, or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups. The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest. Qualification for tax exemption is not perpetual or immutable; some tax exempt groups lose that status when their activities take them outside the classification and new entities can come into being and qualify for exemption.*

*Governments have not always been tolerant of religious activity, and hostility toward religion has taken many shapes and forms economic, political, and sometimes harshly oppressive. Grants of exemption historically reflect the concern of authors of constitutions and statutes as to the latent dangers inherent in the imposition of property taxes; exemption constitutes a reasonable and balanced attempt to guard against those*

*dangers. The limits of permissible state accommodation to religion are by no means coextensive with the noninterference mandated by the Free Exercise Clause. To equate the two would be to deny a national heritage with roots in the Revolution itself. See Sherbert v. Verner, 374 U. S. 398, 374 U. S. 423 (1963)"*

3. The 14th Amendment and Individual Dignity and Autonomy
(via Obergefell v. Hodges, 576 U.S. ___ (2015))

*"The fundamental liberties protected by the Fourteenth Amendment's Due Process Clause extend to certain personal choices central to individual dignity and autonomy, including intimate choices defining personal identity and beliefs. See, e.g., Eisenstadt v. Baird, 405 U. S. 438 ; Griswold v. Connecticut, 381 U. S. 479 –486. Courts must exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect. History and tradition guide and discipline the inquiry but do not set its outer boundaries. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed."*

4. Church is equal to State
(via Ponce v. Roman Catholic Church, 210 U.S. 296 (1908))

*"The Roman Catholic Church has been recognized as possessing legal personality by the Treaty of Paris with Spain of 1898, and its property rights solemnly safeguarded. In so doing, the treaty followed the recognized rule of international law which would have protected the property of the church in Porto Rico subsequent to the cession. The juristic personality of the Roman Catholic Church and its ownership of property was formally recognized by the concordat between Spain and the papacy and by the Spanish laws from the beginning of settlements in the Indies. Such recognition has also been accorded the church by all systems of European law from the fourth century of the Christian era.*

*The fact that a municipality in Porto Rico furnished some of the funds for building or repairing the churches cannot affect the title of the Roman Catholic Church, to whom such funds were thus irrevocably donated and by whom these temples were erected and dedicated to religious uses.*

…

*Article 8 of the Treaty of Paris is to this effect:*

*"And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property or rights which by law belongs to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories, renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be. "*

*...*

*And Milman also points out that, in the barbarian codes, most sweeping provisions are found recognizing the right of the church to acquire property and its inalienability when acquired. Church property everywhere remained untouched by the rude hands of invading barbarians. Trespass upon or interference with such property was severely punished, and gradually it became exempted from taxation.*

*...*

*As to England, the concept of the church as a corporation was worked out by the English canonists and fully recognized by the ordinary law courts before the end of the fourteenth century, and Pollock and Maitland show that the English ecclesiastical law was practically similar to that of continental Europe in its recognition of the property rights of the church.*

*...*

*In this country, it was held in <u>Terrett v. Taylor</u> (1815), 9 Cranch 43, that the Legislature of Virginia could not authorize any persons to take land formerly granted to the Church of England. Mr. Justice Story, speaking for the Court, says (p. <u>13 U. S. 49</u>):*

*"Be, however, the general authority of the legislature as to the subject of religion as it may, it will require other arguments to establish the position that, at the Revolution, all the public property acquired by the Episcopal churches, under the sanction of the laws, became the property of the state. Had the property thus acquired been originally granted by the state or the King, there might have been some color (and it would have been but a color) for such an extraordinary pretension. But the property was, in fact and in law, generally purchased by the parishioners or acquired by the benefactions of pious donors. The title thereto was indefeasibly vested in the churches, or, rather, in their legal agents. It was not in the power of the Crown to seize or assume it, nor of the*

*Parliament itself to destroy the grants, unless by the exercise of a power the most arbitrary, oppressive, and unjust, and endured only because it could not be resisted. . . . Nor are we able to perceive any sound reason why the church lands escheated or devolved upon the state by the Revolution any more than the property of any other corporation created by the royal bounty or established by the legislature."*

…

*This Court further held that it made no difference whether the church was a voluntary society or clothed with corporate powers, and the local authorities were restrained from interfering with the church property or claiming title thereto.*

*It is the settled law of this Court that a dedication to a public or charitable use may exist even where there is no specific corporate entity to take as grantee. Werlein v. New Orleans, 177 U. S. 390, 177 U. S. 401, and see 27 U. S. Kurtz, 2 Pet. 566.*

…

*by reason of the treaty, as well as under the rules of international law prevailing among civilized nations, this property is inviolable."*


## X.   Fifth Cause of Action: Violation of International Agreements

### Universal Declaration of Human Rights. G.A. res. 217A (III). U.N. Doc A/810 at 71 (1948).

### *Article 18*

Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.


### International Covenant on Civil and Political Rights. G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force Mar. 23, 1976.

Article 18

*1. Everyone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching.*

*2. No one shall be subject to coercion which would impair his freedom to have or to adopt a religion or belief of his choice.*

Declaration on the Elimination of All Forms of Intolerance and of Discrimination Based on Religion or Belief, G.A. res. 36/55, 36 U.N. GAOR Supp. (No. 51) at 171, U.N. Doc. A/36/684 (1981).

### Article 1

*1. Everyone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have a religion or whatever belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching.*

*2. No one shall be subject to coercion which would impair his freedom to have a religion or belief of his choice.*

### Article 2

*1. No one shall be subject to discrimination by any State, institution, group of persons, or person on the grounds of religion or other belief.*

*2. For the purposes of the present Declaration, the expression "intolerance and discrimination based on religion or belief" means any distinction, exclusion, restriction or preference based on religion or belief and having as its purpose or as its effect nullification or impairment of the recognition, enjoyment or exercise of human rights and fundamental freedoms on an equal basis.*

### Article 4

*1. All States shall take effective measures to prevent and eliminate discrimination on the grounds of religion or belief in the recognition, exercise and enjoyment of human rights and fundamental freedoms in all fields of civil, economic, political, social and cultural life.*

*2. All States shall make all efforts to enact or rescind legislation where necessary to prohibit any such discrimination, and to take all appropriate measures to combat intolerance on the grounds of religion or other beliefs in this matter.*

**Article 6**

In accordance with article I of the present Declaration, and subject to the provisions of article 1, paragraph 3, the right to freedom of thought, conscience, religion or belief shall include, inter alia, the following freedoms:

(a) To worship or assemble in connection with a religion or belief, and to establish and maintain places for these purposes;

(b) To establish and maintain appropriate charitable or humanitarian institutions;

(c) To make, acquire and use to an adequate extent the necessary articles and materials related to the rites or customs of a religion or belief;

(d) To write, issue and disseminate relevant publications in these areas;

(e) To teach a religion or belief in places suitable for these purposes;

(f) To solicit and receive voluntary financial and other contributions from individuals and institutions;

(g) To train, appoint, elect or designate by succession appropriate leaders called for by the requirements and standards of any religion or belief;

(h) To observe days of rest and to celebrate holidays and ceremonies in accordance with the precepts of one's religion or belief;

(i) To establish and maintain communications with individuals and communities in matters of religion and belief at the national and international levels.

**Article 7**

The rights and freedoms set forth in the present Declaration shall be accorded in national legislation in such a manner that everyone shall be able to avail himself of such rights and freedoms in practice.

Special Rapporteur on freedom of religion or belief (1986)
The Special Rapporteur has been mandated through Human Rights
Council resolution 6/37

1. Condemns all forms of intolerance and of discrimination based on religion or belief as well as violations of the freedom of thought, conscience, religion or belief;

*2. Recognizes with deep concern the overall rise in instances of intolerance and violence directed against members of many religious and other communities in various parts of the world, including cases motivated by Islamophobia, anti-Semitism and Christianophobia;*

*3. Expresses concern over the persistence of institutionalized or social intolerance and discrimination practiced against many in the name of or due to their religion or belief;*

*4. Recalls that legal procedures pertaining to religious or belief-based groups and places of worship are not a prerequisite for the exercise of the right to manifest one's religion or belief;*

*5. Emphasizes that such procedures as described in paragraph 4 above, at the national or local levels, as and when legally required, should be nondiscriminatory in order to contribute to the effective protection of the right of all persons to practise their religion or belief either individually or in community with others and in public or private;*

*…*

*8. Emphasizes that promoting tolerance and acceptance by the public of and its respect for diversity and combating all forms of intolerance and of discrimination based on religion and belief are substantial elements in creating an environment conducive to the full enjoyment by all of the right to freedom of thought, conscience and religion, as enshrined in article 18 of the International Covenant on Civil and Political Rights;*

*9. Urges States:*

*( a) To ensure that their constitutional and legislative systems provide adequate and effective guarantees of freedom of thought, conscience, religion and belief to all without distinction, inter alia, by the provision of effective remedies in cases where the right to freedom of thought, conscience, religion or belief, or the right to practice freely one's religion, including the right to change one's religion or belief, is violated;*

*…*

*( c) To ensure that appropriate measures are taken in order to adequately and effectively guarantee the freedom of religion or belief of women as well as individuals from other vulnerable groups, including persons deprived of their liberty, refugees, children, persons belonging to minorities and migrants;*

...

*( e) To exert the utmost efforts, in accordance with their national legislation and in conformity with international human rights and humanitarian law, to ensure that religious places, sites, shrines and symbols are fully respected and protected and to take additional measures in cases where they are vulnerable to desecration or destruction;*

*( f) To review, whenever relevant, existing registration practices in order to ensure the right of all persons to manifest their religion or belief, alone or in community with others and in public or in private;*

*( g) To ensure, in particular, the right of all persons to worship or assemble in connection with a religion or belief and to establish and maintain places for these purposes and the right of all persons to write, issue and disseminate relevant publications in these areas;*

…

*(j) To ensure that all public officials and civil servants, including members of law enforcement bodies, the military and educators, in the course of their official duties, respect different religions and beliefs and do not discriminate on the grounds of religion or belief, and that all necessary and appropriate education or training is provided;*

Human Rights Committee, General Comment 22, Article 18 (Forty-eighth session, 1993), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 35 (1994).

*2. Article 18 protects theistic, non-theistic and atheistic beliefs, as well as the right not to profess any religion or belief. The terms "belief" and "religion" are to be broadly construed. Article 18 is not limited in its application to traditional religions or to religions and beliefs with institutional characteristics or practices analogous to those of traditional religions. The Committee therefore views with concern any tendency to discriminate against any religion or belief for any reason, including the fact that they are newly established, or represent religious minorities that may be the subject of hostility on the part of a predominant religious community.*

*3. Article 18 distinguishes the freedom of thought, conscience, religion or belief from the freedom to manifest religion or belief. It does not permit any limitations*

*whatsoever on the freedom of thought and conscience or on the freedom to have or adopt a religion or belief of one's choice. These freedoms are protected unconditionally, as is the right of everyone to hold opinions without interference in article 19.1. In accordance with articles 18.2 and 17, no one can be compelled to reveal his thoughts or adherence to a religion or belief.*

*4. The freedom to manifest religion or belief may be exercised "either individually or in community with others and in public or private". The freedom to manifest religion or belief in worship, observance, practice and teaching encompasses a broad range of acts. The concept of worship extends to ritual and ceremonial acts giving direct expression to belief, as well as various practices integral to such acts, including the building of places of worship, the use of ritual formulae and objects, the display of symbols, and the observance of holidays and days of rest. The observance and practice of religion or belief may include not only ceremonial acts but also such customs as the observance of dietary regulations, the wearing of distinctive clothing or headcoverings, participation in rituals associated with certain stages of life, and the use of a particular language customarily spoken by a group. In addition, the practice and teaching of religion or belief includes acts integral to the conduct by religious groups of their basic affairs, such as the freedom to choose their religious leaders, priests and teachers, the freedom to establish seminaries or religious schools and the freedom to prepare and distribute religious texts or publications.*

*5. The Committee observes that the freedom to "have or to adopt" a religion or belief necessarily entails the freedom to choose a religion or belief, including the right to replace one's current religion or belief with another or to adopt atheistic views, as well as the right to retain one's religion or belief. Article 18.2 bars coercion that would impair the right to have or adopt a religion or belief, including the use of threat of physical force or penal sanctions to compel believers or non-believers to adhere to their religious beliefs and congregations, to recant their religion or belief or to convert. Policies or practices having the same intention or effect, such as, for example, those restricting access to education, medical care, employment or the rights guaranteed by article 25 and other provisions of the Covenant, are similarly inconsistent with article 18.2. The same protection is enjoyed by holders of all beliefs of a non-religious nature.*

**XI.    Sixth Cause of Action: Assassination of Character of Religions and Religious Practitioners via Overbroad misuse of the Controlled Substances Act & Misrepresentation of Bhang. As well as Gerrymandering, causing Religious and Medical Violations under the Commerce Clause of the Constitution**

1. Gerrymandering

(via Walz v. Tax Comm'n of City of New York, 397 U.S. 664 (1970))

*"Neutrality in its application requires an equal protection mode of analysis. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders. In any particular case, the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter."*

2. Gerrymandering

(via Stromans V Weisman 579 U. S. _____ (2016))

*"In addition, the ordinances restricted religious practice to a far greater extent than required to serve the municipality's asserted interests. Id., at 538–539. Here, Ralph's has made a strong showing that the challenged regulations are gerrymandered in a similar way. While requiring pharmacies to dispense all prescription medications for which there is demand, the regulations contain broad secular exceptions but none relating to religious or moral objections;"*

3.Gerrymandering

(via Church of the Lukumi Babalu Aye, Inc. v. Hialeah 508 U.S. 520 (1993))

*"The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause "forbids subtle departures from neutrality," Gillette v. United States, 401 U. S. 437, 452 (1971), and "covert suppression of particular religious beliefs," Bowen v. Roy, supra, at 703 (opinion of Burger, C. J.). Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt. "The Court must survey*

*meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." Walz v. Tax Comm'n of New York City, 397 U. S. 664, 696 (1970) (Harlan, J., concurring)."*

### 4. Overbroad Interpretation of Laws, resulting in Injustice, Oppression & Absurd Consequences
### (via Church of the Holy Trinity V United States & United States V Kirby)

*"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always therefore be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter. The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted 'that whoever drew blood in the streets should be punished with the utmost severity' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edw. II which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire, 'for he is not to be hanged because he would not stay to be burnt.' And we think that a like common sense will sanction the ruling we make, that the act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder."*

### 5. Controlled Substances Act Statement of Purpose
### (as per Gonzales v Raich 545 U.S. 1 (2005))

*"For the purposes of consolidating various drug laws into a comprehensive statute, providing meaningful regulation over legitimate sources of drugs to prevent diversion into illegal channels, and strengthening law enforcement tools against international and interstate drug trafficking, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970, Title II of which is the CSA. To effectuate the statutory goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except as*

*authorized by the CSA. 21 U. S. C. §§841(a)(1), 844(a). All controlled substances are classified into five schedules, §812, based on their accepted medical uses, their potential for abuse, and their psychological and physical effects on the body, §§811, 812. Marijuana is classified as a Schedule I substance, §812(c), based on its high potential for abuse, no accepted medical use, and no accepted safety for use in medically supervised treatment, §812(b)(1). This classification renders the manufacture, distribution, or possession of marijuana a criminal offense. §§841(a)(1), 844(a). Pp. 6–11.*

*…*

*Marijuana itself was not significantly regulated by the Federal Government until 1937 when accounts of marijuana's addictive qualities and physiological effects, paired with dissatisfaction with enforcement efforts at state and local levels, prompted Congress to pass the Marihuana Tax Act, Pub. L. 75–238, 50 Stat. 551 (repealed 1970, via Leary V United States). Like the Harrison Act, the Marihuana Tax Act did not outlaw the possession or sale of marijuana outright. Rather, it imposed registration and reporting requirements for all individuals importing, producing, selling, or dealing in marijuana, and required the payment of annual taxes in addition to transfer taxes whenever the drug changed hands. Moreover, doctors wishing to prescribe marijuana for medical purposes were required to comply with rather burdensome administrative requirements. Noncompliance exposed traffickers to severe federal penalties, whereas compliance would often subject them to prosecution under state law. Thus, while the Marihuana Tax Act did not declare the drug illegal per se, the onerous administrative requirements, the prohibitively expensive taxes, and the risks attendant on compliance practically curtailed the marijuana trade.*

*…*

*Then in 1970, after declaration of the national "war on drugs," federal drug policy underwent a significant transformation. A number of noteworthy events precipitated this policy shift. First, in Leary v. United States, 395 U. S. 6 (1969), this Court held certain provisions of the Marihuana Tax Act and other narcotics legislation unconstitutional. Second, at the end of his term, President Johnson fundamentally reorganized the federal drug control agencies. The Bureau of Narcotics, then housed in the Department of Treasury, merged with the Bureau of Drug Abuse Control, then housed in the Department of Health, Education, and Welfare (HEW), to create the Bureau of Narcotics*

*and Dangerous Drugs, currently housed in the Department of Justice. Finally, prompted by a perceived need to consolidate the growing number of piecemeal drug laws and to enhance federal drug enforcement powers, Congress enacted the Comprehensive Drug Abuse Prevention and Control Act.*

*…*

*Title II of that Act, the CSA, repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs. The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances. Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.*

*…*

*By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration pre-approved research study. §§823(f), 841(a)(1), 844(a); see also United States v. Oakland Cannabis Buyers' Cooperative, 532 U. S. 483, 490 (2001)."*

6. United States Pharmacopeia Marijuana Entry
http://www.usp.org/sites/default/files/usp_pdf/EN/USPNF/usp-nf-notices/usp_stim_articl e_medical_cannabis.pdf

"*Outside the U.S., a number of countries have addressed the use of medical cannabis. For example, medical cannabis use has been permitted in Canada since 2001 through enactment of the Marihuana Medical Access Regulations (Regulations) (8). The Regulations permit persons who are suffering from grave and debilitating illness to use, possess, and grow cannabis for medical purposes (8). Recalls of medical cannabis in Canada have highlighted the need for quality controls and regulatory oversight (9). In 1961, the European Community classified cannabis as a Schedule IV drug and strictly controlled its use (10). However, many European countries have since decriminalized or legalized cannabis for medical use (11). In addition, several other countries, including Australia and Israel, have approved medical applications for medical cannabis. As legalization of medical cannabis has become more prevalent, the use of medical*

*cannabis is increasing, especially as patients and the health care community become more actively engaged in the dialogue. This increased use makes it critical to understand the scientific, quality, and public health issues surrounding medical cannabis (12).*

*…*

*In 1850, USP admitted cannabis as a recognized drug in the United States Pharmacopeia (USP) and published an Extractum Cannabis (or Extract of Hemp) monograph (34). Thereafter, USP published a Cannabis americana monograph in 1916 (35). In 1936, USP published in USP XI a monograph for Cannabis sativa L. and also provided monographs for alcohol extracts (Extractum Cannabis and Fluidextracta Cannabis) (36). The National Formulary (NF) and United States Dispensatory also included monographs on cannabis and cited recommendations for its use for numerous illnesses (37). There has not been a marijuana or cannabis monograph published in the USP since its omission in 1942 (USP XII) (38) in response to a concerted effort by the Federal Bureau of Narcotics in the 1930s and further classification of cannabis and tetrahydrocannabinoids as Schedule I drugs in 1970. Cannabis monographs appeared in the British Pharmacopoeia as early as 1888*

*…*

*Ayurvedic Pharmacopoeia of India, Siddha Pharmacopoeia of India (40), Unani Pharmacopoeia of India, and Pharmacopoeia of the People's Republic of China (41). The American Herbal Pharmacopeia has recently proposed a monograph for the flowers (42).*

*…*

*the federal government through the National Institute on Drug Abuse allows the University of Mississippi in Oxford, MS to cultivate, harvest, and roll cannabis into cigarettes for distribution to patients for medical needs (4). These few patients are legally permitted by the federal government (including the Drug Enforcement Administration) to smoke cannabis as a means to alleviate their medical conditions. Despite the status of medical cannabis under federal law, 24 states and the District of Columbia have passed various forms of legislation permitting the use of medical cannabis including laws relating to the cultivation, distribution, and sale of medical cannabis (5). The U.S. Department of Justice has established a policy that it will not enforce federal laws against individuals who use cannabis for medical purposes in*

*states that have legalized use of medical cannabis  but also have robust regulatory and enforcement systems in place (6). As a result, health care providers are navigating inconsistent and conflicting laws and regulations when they prepare to prescribe, dose, and prepare formulations"*

7.  Commerce Clause
(as per Gonzales v Raich 545 U.S. 1 (2005))

*"The Court of Appeals distinguished prior Circuit cases upholding the CSA in the face of Commerce Clause challenges by focusing on what it deemed to be the "separate and distinct class of activities" at issue in this case: "the intrastate, noncommercial cultivation and possession of cannabis for personal medical purposes as recommended by a patient's physician pursuant to valid California state law." Id., at 1228. The court found the latter class of activities "different in kind from drug trafficking" because interposing a physician's recommendation raises different health and safety concerns, and because "this limited use is clearly distinct from the broader illicit drug market—as well as any broader commercial market for medicinal marijuana—insofar as the medicinal marijuana at issue in this case is not intended for, nor does it enter, the stream of commerce." Ibid.*

*…*

*The majority placed heavy reliance on our decisions in United States v. Lopez, <u>514 U. S. 549</u> (1995), and United States v. Morrison, <u>529 U. S. 598</u> (2000), as interpreted by recent Circuit precedent, to hold that this separate class of purely local activities was beyond the reach of federal power. In contrast, the dissenting judge concluded that the CSA, as applied to respondents, was clearly valid under Lopez and Morrison; moreover, he thought it "simply impossible to distinguish the relevant conduct surrounding the cultivation and use of the marijuana crop at issue in this case from the cultivation and use of the wheat crop that affected interstate commerce in Wickard v. Filburn." 352 F. 3d, at 1235*

*…*

*In assessing the validity of congressional regulation, none of our Commerce Clause cases can be viewed in isolation. As charted in considerable detail in United States v. Lopez, our understanding of the reach of the Commerce Clause, as well as Congress' assertion of authority thereunder, has evolved over time. The Commerce Clause emerged as the Framers' response to the central problem giving rise to the Constitution*

*itself: the absence of any federal commerce power under the Articles of Confederation. For the first century of our history, the primary use of the Clause was to preclude the kind of discriminatory state legislation that had once been permissible. Then, in response to rapid industrial development and an increasingly interdependent national economy, Congress "ushered in a new era of federal regulation under the commerce power," beginning with the enactment of the Interstate Commerce Act in 1887, 24 Stat. 379, and the Sherman Antitrust Act in 1890, 26 Stat. 209, as amended, 15 U. S. C. §2 et seq.*

*…*

*Cases decided during that "new era," which now spans more than a century, have identified three general categories of regulation in which Congress is authorized to engage under its commerce power. First, Congress can regulate the channels of interstate commerce. Perez v. United States, 402 U. S. 146, 150 (1971). Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Ibid. Third, Congress has the power to regulate activities that substantially affect interstate commerce. Ibid.; NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1, 37 (1937). Only the third category is implicated in the case at hand."*

### 8. Religion and the Commerce Clause
(via Burwell v. Hobby Lobby Stores, Inc. 573 U.S. ___ (2014))

*"Following our decision in City of Boerne, Congress passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114Stat. 803, 42 U. S. C. §2000cc et seq. That statute, enacted under Congress's Commerce and Spending Clause powers, imposes the same general test as RFRA but on a more limited category of governmental actions. See Cutter v. Wilkinson, 544 U. S. 709 –716 (2005). And, what is most relevant for present purposes, RLUIPA amended RFRA's definition of the "exercise of religion." See §2000bb–2(4) (importing RLUIPA definition). Before RLUIPA, RFRA's definition made reference to the First Amendment. See §2000bb–2(4) (1994 ed.) (defining "exercise of religion" as "the exercise of religion under the First Amendment"). In RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment and defined the "exercise of religion" to include "any exercise of religion, whether or not*

compelled by, or central to, a system of religious belief." §2000cc–5(7)(A). And
Congress mandated that this concept "be construed in favor of a broad protection of
religious exercise, to the maximum extent permitted by the terms of this chapter and the
Constitution." §2000cc–3(g)."

### 9. Overbreadth Doctrine
(via Larson v. Valente 456 U.S. 228 (1982))

"The Magistrate therefore recommended, inter alia, that appellees be granted the
declarative and permanent injunctive relief that they had sought -- namely, a declaration
that the Act was unconstitutional as applied to religious organizations and their
members, and an injunction against enforcement of the Act as to any religious
organization. Accepting these recommendations, the District Court entered summary
judgment in favor of appellees on these issues. [Footnote 9]
On appeal, the United States Court of Appeals for the Eighth Circuit affirmed in part and
reversed in part. 637 F.2d 562 (1981). On the issue of standing, the Court of Appeals
affirmed the District Court's application of the overbreadth doctrine, citing Village of
Schaumburg v. Citizens for Better Environment, 444 U. S. 620, 444 U. S. 634 (1980)
…
As our citations of Board of Education v. Allen, 392 U. S. 236 (1968), and Walz v. Tax
Comm'n, 397 U. S. 664 (1970), indicated, the Lemon v. Kurtzman "tests" are intended
to apply to laws affording a uniform benefit to ALL religions"

### 10. DEA Judge Francis Young, findings of fact
http://www.ccguide.org/young88.php

"Nearly all medicines have toxic, potentially lethal effects. But marijuana is not such a
substance. There is no record in the extensive medical literature describing a proven,
documented cannabis-induced fatality.
…
…the record on Marijuana encompasses 5,000 years of human experience.
…
By contrast aspirin, a commonly used, over-the-counter medicine, causes hundreds of
deaths each year.

...

*researchers have been unable to give animals enough marijuana to induce death.*

...

*At present it is estimated that marijuana's LD-50 is around 1:20,000 or 1:40,000. In layman terms this means that in order to induce death a marijuana smoker would have to consume 20,000 to 40,000 times as much marijuana as is contained in one marijuana cigarette. NIDA-supplied marijuana cigarettes weigh approximately .9 grams. A smoker would theoretically have to consume nearly 1,500 pounds of marijuana within about fifteen minutes to induce a lethal response.*

...

*In strict medical terms marijuana is far safer than many foods we commonly consume. For example, eating ten raw potatoes can result in a toxic response. By comparison, it is physically impossible to eat enough marijuana to induce death."*

11. Federal Marijuana Patients (Patients who are sent Marijuana by the US Government)

http://medicalmarijuana.procon.org/view.answers.php?questionID=257

Compassionate Investigational New Drug (IND) patients, four of whom are still living as of Apr. 18, 2014:

| Name of Patient (in alphabetical order) | Diagnosis | Date Entered IND Program | Marijuana Dosage Per Month (One cured ounce is about 40 cigarettes) | Status (as of Apr. 18, 2014) |
|---|---|---|---|---|
| 1. Douglass, Barbara | Multiple Sclerosis | Aug. 30, 1991 | Nine cured oz (360 joints) | Active program participant |
| 2. Jenks, Barbra | AIDS | Feb. 19, 1991 (1st shipment) | Unknown | Passed away Mar. 28, 1992 |

| 3. Jenks, Kenny | AIDS | Feb. 19, 1991 (1st shipment) | Unknown | Passed away July 19, 1993 |
|---|---|---|---|---|
| 4. McMahon, George | Nail Patella Syndrome | Mar. 16, 1990 | Eight cured oz (320 joints) | Active program participant |
| 5. Millet, Corrine | Glaucoma | Nov. 16, 1990 | Four cured oz (160 joints) | Passed away Dec. 2007 |
| 6. Musikka, Elvy | Glaucoma | Oct. 17, 1988 | Eight cured oz (320 joints) | Active program participant |
| 7. Randall, Robert | Glaucoma | Nov. 1976 | Unknown | Passed away June 2, 2001 |
| 8. Rosenfeld, Irvin | Multiple Congenital Cartilaginous Exostoses | Nov. 20, 1982 | Nine cured oz (360 joints) | Active program participant |

12. Exemption for Industrial Purposes, Gerrymandering

7 U.S. Code § 5940

"*(a) In generalNotwithstanding the Controlled Substances Act (21 U.S.C. 801 et seq.), chapter 81 of title 41, or any other Federal law, an institution of higher education (as defined in section 1001 of title 20) or a State department of agriculture may grow or cultivate industrial hemp if—*

*(1)*

*the industrial hemp is grown or cultivated for purposes of research conducted under an agricultural pilot program or other agricultural or academic research; and*

*(2)*

*the growing or cultivating of industrial hemp is allowed under the laws of the State in which such institution of higher education or State department of agriculture is located and such research occurs."*

## XII.    Seventh Cause of Action: Defendant Uses Controlled Substances Act to Create Monopolies

1. Stepan is a Coca Leaf Extract and Cocaine Monopoly in America, perpetuated by the DEA

https://www.deadiversion.usdoj.gov/fed_regs/manufact/reg/2016/fr0414_3.htm

*"The DEA has considered the factors in 21 U.S.C. 823(a) and determined that the registration of Stepan Company to manufacture the basic classes of controlled substances is consistent with the public interest and with United States obligations under international treaties, conventions, or protocols in effect on May 1, 1971. The DEA investigated the company's maintenance of effective controls against diversion by inspecting and testing the company's physical security systems, verifying the company's compliance with state and local laws, and reviewing the company's background and history.*

*Therefore, pursuant to 21 U.S.C. 823(a), and in accordance with 21 CFR 1301.33, the above-named company is granted registration as a bulk manufacturer of the following basic classes of controlled substances:*

| Cocaine (9041) | II |
| Ecgonine (9180) | II |

*The company plans to manufacture the listed controlled substances in bulk for distribution to its customers.*

*Dated: April 4, 2016*

**Louis J. Milione,**
*Deputy Assistant Administrator."*

2. The Controlled Substances Act is perpetuating Illegal Monopolies

15 U.S. Code § 1

*"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."*

3.

§ 1 Clayton Act, 15 U.S.C. § 12

Definitions;

*(a) "Commerce," as used herein, means trade or commerce among the several States and with foreign nations, or between the District of Columbia or any Territory of the United States and any State, Territory, or foreign nation, or between any insular possessions or other places under the jurisdiction of the United States, or between any such possession or place and any State or Territory of the United States or the District of Columbia or any foreign nation, or within the District of Columbia or any Territory or any insular possession or other place under the jurisdiction of the United States: Provided, That nothing in this Act contained shall apply to the Philippine Islands.*

*The word "person" or "persons" wherever used in this Act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.*

4. To purposely allow one company to produce something, whether by the companies own efforts to push others out, or by legislation, is the essence of Monopoly
(via United States v. E. C. Knight Co. 156 U.S. 1 (1895))

*"In commenting upon the statute, 21 Jac. I. c. 3, at the commencement of chapter 85 of the third institute, entitled "Against Monopolists, Propounders, and Projectors," Lord Coke, in language often quoted, said:*

*"It appeareth by the preamble of this act (as a judgment in Parliament) that all grants of monopolies are against the ancient and fundamental laws of this kingdome. And therefore it is necessary to define what a monopoly is."*

*"A monopoly is an institution, or allowance by the King by his grant, commission, or otherwise to any person or persons, bodies politique, or corporate, of or for the sole buying, selling, making, working, or using of anything, whereby any person or persons, bodies politique, or corporate, are sought to be restrained of any freedome or liberty that they had before or hindred in their lawfull trade."*

*"For the word 'monopoly,' dicitur [Greek phrase] (i. solo,) [Greek phrase] (i. vendere) quodest cum unus solus aliquod genus mercaturae universum vendit, ut solus vendat, pretium and suum libitum statuens: hereof you may read more at large in that case. Trin. 44 Eliz. Lib. 11, f. 84, 85; le case de monopolies."*

…

*Counsel contend that this definition, as explained by the derivation of the word, may be applied to all cases in which "one person sells alone the whole of any kind of marketable thing, so that only he can continue to sell it, fixing the price at his own pleasure," whether by virtue of legislative grant or agreement; that the monopolization referred to in the act of Congress is not confined to the common law sense of the term as implying an exclusive control, by authority, of one branch of industry without legal right of any other person to interfere therewith by competition or otherwise, but that it includes engrossing as well, and covers controlling the market by contracts securing the advantage of selling alone or exclusively all or some considerable portion of a particular kind or merchandise or commodity to the detriment of the public, and that such contracts amount to that restraint of trade or commerce declared to be illegal.*

…

*The relief of the citizens of each state from the burden of monopoly and the evils resulting from the restraint of trade among such citizens was left with the states to deal*

*with, and this Court has recognized their possession of that power even to the extent of holding that an employment or business carried on by private individuals, when it becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen -- in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort, and by means of which a tribute can be exacted from the community -- is subject to regulation by state legislative power.*

*…*

*And Mr. Justice Lamar remarked:*

*"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce. Manufacture is transformation -- the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling, and the transportation incidental thereto, constitute commerce, and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. . . . If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the states, with the power to regulate not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining -- in short, every branch of human industry. For is there one of them that does not contemplate more or less clearly an interstate or foreign market? Does not the wheat grower of the Northwest and the cotton planter of the South plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the states, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform, and vital interests -- interests which in their nature are, and must be, local in all the details of their successful management. . . . The demands of such supervision would require not uniform legislation generally applicable throughout the United States, but a swarm of statutes only locally applicable and utterly inconsistent. Any movement towards the establishment of rules of production in this vast country, with its many different climates and opportunities, would only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of everyone of them. On the other hand, any movement towards the local, detailed, and incongruous legislation*

*required by such interpretation would be about the widest possible departure from the declared object of the clause in question. Nor this alone. Even in the exercise of the power contended for, Congress would be confined to the regulation not of certain branches of industry, however numerous, but to those instances in each and every branch where the producer contemplated an interstate market. These instances would be almost infinite, as we have seen, but still there would always remain the possibility, and often it would be the case, that the producer contemplated a domestic market. In that case, the supervisory power must be executed by the state, and the interminable trouble would be presented that whether the one power or the other should exercise the authority in question would be determined not by any general or intelligible rule, but by the secret and changeable intention of the producer in each and every act of production. A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the states, and less likely to have been what the framers of the Constitution intended, it would be difficult to imagine."*

…

*The object was manifestly private gain in the manufacture of the commodity, but not through the control of interstate or foreign commerce. It is true that the bill alleged that the products of these refineries were sold and distributed among the several states, and that all the companies were engaged in trade or commerce with the several states and with foreign nations; but this was no more than to say that trade and commerce served manufacture to fulfill its function. Sugar was refined for sale, and sales were probably made at Philadelphia for consumption, and undoubtedly for resale by the first purchasers throughout Pennsylvania and other states, and refined sugar was also for warded by the companies to other states for sale. Nevertheless it does not follow that an attempt to monopolize, or the actual monopoly of, the manufacture was an attempt, whether executory or consummated, to monopolize commerce, even though, in order to dispose of the product, the instrumentality of commerce was necessarily invoked."*


5. Stream of Commerce Monopoly

(via Swift & Co. v. United States, <u>196 U.S. 375</u> (1905))

*"For the same purposes, and to monopolize the commerce protected by the statute, the defendants combine "to arbitrarily, from time to time raise, lower, and fix prices, and to*

maintain uniform prices at which they will sell" to dealers throughout the States. This is effected by secret periodical meetings, where are fixed prices to be enforced until changed at a subsequent meeting. The prices are maintained directly, and by collusively restricting the meat shipped by the defendants, whenever conducive to the result, by imposing penalties for deviations, by establishing a uniform rule for the giving of credit to dealers, etc., and by notifying one another of the delinquencies of such dealers and keeping a black list of delinquents, and refusing to sell meats to them.

…

By force of the consequent inability of competitors to engage or continue in such commerce, the defendants are attempting to monopolize, have monopolized, and will monopolize the commerce in livestock and fresh meats among the States and Territories, and with foreign countries, and, 11, the defendants are and have been in conspiracy with each other, with the railroad companies and others unknown, to obtain a monopoly of the supply and distribution of fresh meats throughout the United States, etc. And, to that end, defendants artificially restrain the commerce and put arbitrary regulations in force affecting the same from the shipment of the livestock from the plains to the final distribution of the meats to the consumers. There is a prayer for an injunction of the most comprehensive sort against all the foregoing proceedings and others, for discovery of books and papers relating directly or indirectly to the purchase or shipment of livestock, and the sale or shipment of fresh meat, and for an answer under oath.

…

The general objection is urged that the bill does not set forth sufficient definite or specific facts. This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading. If, as we must assume, the scheme is entertained, it is, of course, contrary to the very words of the statute. Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place. The elements, too, are so numerous and shifting, even the constituent parts alleged are, and from their nature must be, so extensive in time and space, that something of the same impossibility applies to them. The law has been upheld, and therefore we are bound to enforce it notwithstanding these difficulties. On the other hand, we equally are bound by the first principles of justice not to sanction a decree so vague as to put the whole conduct of the defendants' business at the peril of a summons for contempt. We

*cannot issue a general injunction against all possible breaches of the law. We must steer between these opposite difficulties as best we can.*

*…*

*The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is suggested that the several acts charged are lawful, and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful. Aikens v. Wisconsin, 195 U. S. 194, 195 U. S. 206. The statute gives this proceeding against combinations in restraint of commerce among the States and against attempts to monopolize the same. Intent is almost essential to such a combination, and is essential to such an attempt. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent -- for instance, the monopoly -- but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. Commonwealth v. Peaslee, 177 Massachusetts 267, 272. But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result. What we have said disposes incidentally of the objection to the bill as multifarious. The unity of the plan embraces all the parts.*

*…*

*On the allegations of the bill, the latter commerce no less, perhaps even more, than commerce within a single State is an object of attack. See Leloup v. Port of Mobile, 127 U. S. 640, 127 U. S. 647; Crutcher v. Kentucky, 141 U. S. 47, 141 U. S. 59; Allen v. Pullman Co., 191 U. S. 171, 191 U. S. 179, 191 U. S. 180. Moreover, it is a direct object, it is that for the sake of which the several specific acts and courses of conduct are done and adopted. Therefore the case is not like United States v. E. C. Knight Co., 156 U. S. 1, where the subject matter of the combination was manufacture and the direct object monopoly of manufacture within a State. However likely monopoly of commerce among the States in the article manufactured was to follow from the agreement, it was not a necessary consequence nor a primary end. Here, the subject*

*matter is sales, and the very point of the combination is to restrain and monopolize commerce among the States in respect of such sales. The two cases are near to each other, as sooner or later always must happen where lines are to be drawn, but the line between them is distinct. Montague & Co. v. Lowry, 193 U. S. 38.*

*…*

*And we need not trouble ourselves at this time as to whether the statute could be escaped by any arrangement as to the place where the sale, in point of law, is consummated. See Norfolk & Western Ry. v. Sims, 191 U. S. 441. But the sixth section of the bill charges an interference with such sales, a restraint of the parties by mutual contract and a combination not to compete in order to monopolize. It is immaterial if the section also embraces domestic transactions.*

*…*

*The question is how it would stand if the tenth section were the whole bill. Not every act that may be done with intent to produce an unlawful result is unlawful, or constitutes an attempt. It is a question of proximity and degree. The distinction between mere preparation and attempt is well known in the criminal law. Commonwealth v. Peaslee, 177 Massachusetts 267, 272. The same distinction is recognized in cases like the present. United States v. E. C. Knight Co., 156 U. S. 1, 156 U. S. 13; Kidd v. Pearson, 128 U. S. 1, 128 U. S. 23, 128 U. S. 24. We are of opinion, however, that such a combination is within the meaning of the statute. It is obvious that no more powerful instrument of monopoly could be used than an advantage in the cost of transportation. And even if the advantage is one which the act of 1887 permits, which is denied, perhaps inadequately, by the adjective "unlawful," still a combination to use it for the purpose prohibited by the act of 1890 justifies the adjective and takes the permission away."*

## 6. The Powers of Congress

### Section 8.

*The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United*

*States; but all duties, imposts and excises shall be uniform throughout the United States;*

*To borrow money on the credit of the United States;*

*To regulate commerce with foreign nations, and among the several states, and with the Indian tribes;*

*To establish a uniform rule of naturalization, and uniform laws on the subject of bankruptcies throughout the United States;*

*To coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures;*

*To provide for the punishment of counterfeiting the securities and current coin of the United States;*

*To establish post offices and post roads;*

*To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries;*

*To constitute tribunals inferior to the Supreme Court;*

*To define and punish piracies and felonies committed on the high seas, and offenses against the law of nations;*

*To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;*

*To raise and support armies, but no appropriation of money to that use shall be for a longer term than two years;*

*To provide and maintain a navy;*

*To make rules for the government and regulation of the land and naval forces;*

*To provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions;*

*To provide for organizing, arming, and disciplining, the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress;*

*To exercise exclusive legislation in all cases whatsoever, over such District (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of*

*the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings;--And*

*To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof.*

### Section 9.

*The migration or importation of such persons as any of the states now existing shall think proper to admit, shall not be prohibited by the Congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person.*

*The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it.*

*No bill of attainder or ex post facto Law shall be passed.*

*No tax or duty shall be laid on articles exported from any state.*

*No preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another: nor shall vessels bound to, or from, one state, be obliged to enter, clear or pay duties in another.*

*No money shall be drawn from the treasury, but in consequence of appropriations made by law; and a regular statement and account of receipts and expenditures of all public money shall be published from time to time.*

*No title of nobility shall be granted by the United States: and no person holding any office of profit or trust under them, shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state."*

## XIII.    Eighth Cause of Action: The Defendant Claims that there are no known Medical Benefits of Marijuana

1. Defendant claims that Marijuana has no known Medical use, and uses that as a pretense to oppress Religious Rights, they are very wrong (see Exhibit 12)

## XIV.    Claim

The Plaintiff claims that the Controlled Substances Act (CSA) is Unconstitutional
As-Applied and Dangerous on its face (Possibly Unconstitutional on its face), as well as
perpetuates Monopolies, and challenges it under Federal Rules of Civil Procedure, Rule
5.1

Rule 5.1

(a) Notice by a Party. A party that files a pleading, written motion, or other paper
drawing into question the constitutionality of a federal or state statute must promptly:

(1) file a notice of constitutional question stating the question and identifying the paper
that raises it, if:

(A) a federal statute is questioned and the parties do not include the United States, one
of its agencies, or one of its officers or employees in an official capacity; or

(B) a state statute is questioned and the parties do not include the state, one of its
agencies, or one of its officers or employees in an official capacity; and

(2) serve the notice and paper on the Attorney General of the United States if a federal
statute is questioned—or on the state attorney general if a state statute is
questioned—either by certified or registered mail or by sending it to an electronic
address designated by the attorney general for this purpose.

(b) Certification by the Court. The court must, under 28 U.S.C. §2403, certify to the
appropriate attorney general that a statute has been questioned.

(c) Intervention; Final Decision on the Merits. Unless the court sets a later time, the
attorney general may intervene within 60 days after the notice is filed or after the court
certifies the challenge, whichever is earlier. Before the time to intervene expires, the
court may reject the constitutional challenge, but may not enter a final judgment holding
the statute unconstitutional.

(d) No Forfeiture. A party's failure to file and serve the notice, or the court's failure to
certify, does not forfeit a constitutional claim or defense that is otherwise timely
asserted.

§ 4 Clayton Act, 15 U.S.C. § 15

Suits by persons injured

(a) Amount of recovery; prejudgment interest

*Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only-*

*1. whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;  2. whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and 3. whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.*

Pierce v. Society of Sisters 268 U.S. 510 (1925)

*"The injury to appellees was present and very real, not a mere possibility in the remote future. If no relief had been possible prior to the effective date of the Act, the injury would have become irreparable. Prevention of impending injury by unlawful action is a well recognized function of courts of equity."*

USC Title 42 Chapter 21B
USC Title 42 Chapter 21C
18 U.S. Code Chapter 96 -RICO

**XV.    Prayer for Relief**

Whereby the Plaintiff Prays the Court, terminate the Illegal Monopoly, Overturn any laws being used Unconstitutionally (Primarily the Controlled Substances Act), Yick Wo v. Hopkins 118 U.S. 356 (1886), Leary v. United States 395 U.S. 6 (1969), Release any Class Member who is currently illegally jailed, award all Class Members damaged by the Monopoly's operations or subsequent arrests a sum of at least $10,000 each (or equal to damage) for damages, at least $1,000,000 each for resulting deaths, and $50,000 to $200,000 each for illegal arrests (for their time and damage to their lives and reputation), as well as release Religious Captives from the Class and award each of them $50,000 to $200,000 (for their time and damage to their lives and reputation), and give an award of at least $5,000 to all Class Members who have been in fear of their Freedom/Safety for Practicing their Religion or of being Harmed/Arrested by the Operations of the Monopoly.

28 U.S. Code Chapter 171 -Tort

42 U.S. Code § 1983 - Rights Violated

28 U.S. Code § 1332 -Class Action

28 U.S. Code § 1714 -Class Rights

42 U.S. Code § 1988 -Vindication of Rights


And order the Media to report on the Judgement, as per the following Statute

§ 5 Clayton Act, 15 U.S.C. § 16 (Tunney Act)

*(c) Publication of summaries in newspapers*

*The United States shall also cause to be published, commencing at least 60 days prior to the effective date of the judgment described in subsection (b) of this section, for 7 days over a period of 2 weeks in newspapers of general circulation of the district in which the case has been filed, in the District of Columbia, and in such other districts as the court may direct--*

*i. a summary of the terms of the proposal for the consent judgment,  ii. a summary of the competitive impact statement filed under subsection (b) of this section,  iii. and a list of the materials and documents under subsection (b) of this section which the United States shall make available for purposes of meaningful public comment, and the place where such materials and documents are available for public inspection.*

Before me, _Carmen C Cardenas_____, on this day personally appeared _Ryan Gallagher_____, known to me, or proved to me through _Colorado Driver License_ (identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____3rd_____ day of _October___, (year). _2016_

_____
Signature of Plaintiff

_____
Signature of Notary

CARMEN CELESTINA CARDENAS
NOTARY PUBLIC-STATE OF TEXAS
MY COMM. EXP. 12/4/2017
NOTARY ID 12807259-2

Ryan Gallagher

October 3rd, 2016

103 E 31st
Austin, TX 78705

720-369-8172
mahatmajupa@gmail.com